2022 IL App (1st) 190496-U

THIRD DIVISION
April 27, 2022

No. 1-19-0496

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 18 CR 13976 |
| | ) | |
| SPENCER WILLIAMS, | ) | Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE ELLIS delivered the judgment of the court.
Justice Burke concurred in the judgment.
Presiding Justice Gordon specially concurred.

**ORDER**

¶ 1    *Held*:   Vacated and remanded with directions. Record is insufficient to determine whether gun and ammunition would have been discovered during lawful inventory search, such that inevitable-discovery doctrine would apply. State proved defendant's knowledge of gun's presence in car beyond reasonable doubt. Remanded for evidentiary hearing on inevitable discovery.

¶ 2    During a warrantless search of defendant Spencer Williams's car, an officer removed a purportedly loose panel covering the center console and found a hidden gun and ammunition. Defendant was convicted of being an armed habitual criminal after a consolidated suppression hearing and bench trial at which he challenged the search on fourth-amendment grounds.

¶ 3    The trial court found, if implicitly, that the search violated the fourth amendment. But on its own initiative, the trial court invoked the inevitable-discovery rule, finding that the gun and ammunition would have been discovered during a lawful inventory search of the car, incident to towing and impoundment. Thus, any fourth-amendment violation was attenuated from the discovery of the gun. This ruling is the principal point of error raised on appeal.

¶ 4    Whether the court's ruling will prove correct or incorrect, it was premature at this stage, absent an evidentiary hearing or any evidence of inevitable discovery put forth by the State. The doctrine of inevitable discovery, as the trial court applied it here, raises numerous questions that cannot be answered based on the record as it stands. Some pertain to the facts of this particular search; others pertain to the policies and standardized procedures, if any, that govern inventory searches carried out by Chicago Police Department (CPD) officers. We thus vacate defendant's conviction and remand for an evidentiary hearing on inevitable discovery. We also reject defendant's challenge to the sufficiency of the State's evidence that he had knowledge of the gun's presence in the car.

¶ 5                                    BACKGROUND

¶ 6                                    I. The search

¶ 7    The only witness at the consolidated suppression and trial proceeding was Chicago Police Officer Jaeho Jung. Shortly before midnight on September 10, 2018, Officer Jung was on patrol with his partners in Jackson Park, checking for after-hours parking (or any other) violations. One lot, in particular, is open to the public until 11:00 p.m., but after that, it is restricted to cars that have permit stickers from La Rabida Children's Hospital.

¶ 8    Defendant was sitting in his car, alone and with the lights on, in the restricted lot. He did not have a permit sticker. As Officer Jung approached, defendant bent forward and downward.

But the officer did not see a weapon, and he did not consider defendant a threat at that time. The conversation and events to follow were recorded by Officer Jung's body worn camera (BWC). That recording was introduced into evidence, as were several other officers' BWC recordings.

¶ 9    On the BWC recording, Officer Jung explained to defendant that the park was closed. Defendant clearly responded, "my people inside the hospital." He asked the officer if he could call "and tell her" (whomever he was referring to) that he would "meet her somewhere else" and then move his car from the restricted lot. Officer Jung did not directly engage with that request. Instead, he asked for defendant's identification.

¶ 10    The officer told the story a bit differently on the stand. According to the officer, defendant said his *father* was in the hospital, and since La Rabida is a children's hospital, Officer Jung asked to see defendant's identification, the implication being that he found the explanation suspicious. Officer Jung also noted that the security guard did not walk over to confirm that defendant was a hospital visitor, which the officer apparently would have expected.

¶ 11    Defendant turned over his driver's license. While Officer Jung was running a name check, defendant got out of the car and opened the trunk. Another officer told him to get back in the car, and he did.

¶ 12    As it happened, there was an outstanding warrant for defendant's arrest. The offense of arrest was never established at trial. Defendant stood by the officer's squad car, handcuffed and accompanied by four other officers, while Officer Jung searched defendant's car.

¶ 13    The BWC footage shows the officer searching, at first, the driver's side door, the center console, and the glove compartment—the area within reach of the driver's seat, as Officer Jung said. Finding nothing of note, he continued to search. Eventually, he removed a panel covering part of the center console, immediately to the right of the driver's legs. Officer Jung testified that

the "right side bottom" of the panel was "already loose," so he "pulled it" off. A semi-automatic pistol and additional magazine were hidden behind it, underneath the center console. The officer acknowledged that these items were not visible until the panel was removed.

¶ 14    The BWC videos did not capture this part of the search; the events in question take place out of frame. In particular, they do not show Officer Jung removing the panel, nor do they reveal just how "loose" the bottom right side may have been. But much of the panel is visible for a time, and what is visible appears to be intact and flush to the center console.

¶ 15    Upon discovering the gun, Officer Jung exclaimed, "got it," and "Bingo-eee." Despite being handcuffed and surrounded by four officers, defendant started to run—and got nowhere. Officer Jung searched the rest of the car. Defendant repeatedly asked the other officers, "What's in the car?" And when an officer asked defendant if he had a FOID card, defendant asked, "For what?" The officer replied, "For a gun," and defendant said, "I don't got no gun."

¶ 16    Defendant's car was driven to the station, from which it was towed to the impound lot. Officer Jung testified that a car improperly parked in that lot "can be towed." He also testified, however, that there was only one reason defendant's car was removed and impounded, and that was the discovery of the gun.

¶ 17                                    II. Evidence of knowledge

¶ 18    After he was *Mirandized* at the station, defendant agreed to talk to Officer Jung. The interview was recorded on Officer Jung's BWC. Defense counsel relied on that recording in the motion for new trial, and the recording is included in the record on appeal. But, as the State points out, it was not introduced into evidence at trial.

¶ 19    In any event, Officer Jung testified to statements defendant allegedly made *after* the interview, when Officer Jung remained in the room with defendant to complete an inventory and

other paperwork. Officers Aguirre and Gibbons came in and out of the room to discuss the case. There is no BWC footage of the post-interview period.

¶ 20    According to Officer Jung, Officer Gibbons asked how the magazines should be classified—regular, extended, or high capacity. Defendant interjected that the magazines came with the gun and were not high capacity. Officer Jung testified that defendant made further statements and kept changing his story about his knowledge of the gun. When Officer Gibbons asked where it was found, defendant "like started talking—like, started stating there's no way that I could have seen it, because there were a lot of items within the center console."

¶ 21    Officer Jung acknowledged that he did not mention these statements in his report, that his trial testimony was the first time he had claimed that defendant commented on the magazines. On redirect, the State refreshed Officer Jung's recollection with his case report, which stated: "Arresting officer informed RO about the recovered magazines, stating that they are factory and not extended or high capacity. Offender also asks how Officer removed the center console when he never observed RO recovering the weapon." The State asked Officer Jung if "that was in reference to the statements you heard the Defendant making at the station that you testified to?" He answered "yes."

¶ 22                        III. Arguments and findings

¶ 23    After the State's case, which comprised Officer Jung's testimony and certified copies of defendant's qualifying convictions, the trial court heard defendant's motion to suppress. Defense counsel argued, in sum, that the search was invalid under *Arizona v. Gant*, 556 U.S. 332 (2009), the controlling precedent for a warrantless automobile search incident to the driver's arrest. The State did not make any argument at all in defense of the search.

¶ 24    The trial court asked counsel what to make of the fact that defendant's car was parked illegally. Counsel answered that "they could have called for a tow; and when the tow truck got there, they could have searched the car, pursuant to the tow." But, counsel noted, "[t]hey never called for a tow." And, counsel noted, Officer Jung testified that "the only reason they took the car, was because they found a gun."

¶ 25    The trial court acknowledged that testimony. Even still, the judge said, "I don't think they're going to leave a car there indefinitely, when it's not supposed to be there. It's a restricted area." Thus, the court concluded, "it's like an inevitable discovery, because they're going to search it anyway, because there's no way when he's arrested on a warrant in the car, and the car is in a prohibited spot, that the car's just going to be left there." So the police "would have found that gun, in any event." The trial court thus denied the motion to suppress.

¶ 26    In closing, counsel argued, in so many words, that the State failed to prove that defendant knew the gun was in the car, emphasizing that the State offered no proof that defendant owned the car, that there was no forensic evidence tying him to the gun, and that gun was "behind the hidden panel." The State did not make a closing argument.

¶ 27    The trial court found Officer Jung "credible and compelling" and specifically credited the officer's testimony that defendant spontaneously told the officers about the magazine, thus "indicating knowledge of the gun and certainly knowledge that he had it." The court also noted defendant's shifting stories, as the officer testified; as well as defendant's attempted flight, which the court considered evidence of his consciousness of guilt.

¶ 28    In the motion for new trial, counsel reiterated that the police did not, in fact, tow the car from the parking lot (they drove it, and then had it towed from the station), and asked the court to reconsider its ruling on the motion to suppress on this basis. As for defendant's knowledge of the

gun, counsel argued that it was "quite significant" that everything *but* defendant's allegedly inculpatory statements was captured on video. The trial court seemed unaware that there was any BWC footage from the stationhouse interview—recall that it was not introduced into evidence— but counsel pointed out that there was, and that these alleged statements were not on it.

¶ 29    The trial court stood by its findings on the "credibility issues" and its "legal" rulings on the "fourth amendment issues." The court sentenced defendant to 90 months in prison.

¶ 30                                    ANALYSIS

¶ 31                            I. Sufficiency of Evidence

¶ 32    We begin with defendant's challenge to the sufficiency of the evidence, as no trial error need be reviewed if defendant was not proven guilty beyond a reasonable doubt.

¶ 33    To prove defendant guilty of being an armed habitual criminal, the State had to prove that he *knowingly* possessed the gun found behind the center-console panel. See 720 ILCS 5/4-2, 24-1.7(a) (West 2018). The gun was in a concealed location, and the State did not offer any proof that defendant owned the car or any forensic evidence, like DNA or fingerprints, linking him to the gun. The trial court explicitly based its finding as to the knowledge element on two pieces of evidence: (1) defendant's statement to Officer Jung about the magazines, and (2) his attempted flight from the scene when the officer found the gun. Defendant contends that this evidence was insufficient to prove beyond a reasonable doubt that he knew the gun was in the car.

¶ 34    If defendant's sufficiency challenge is to succeed, he must show that this evidence was so "unreasonable, improbable, or unsatisfactory" that no rational trier of fact, viewing it in the light most favorable to the State, could accept it as proof beyond a reasonable doubt that he knew the gun was in the car. *People v. Ross*, 229 Ill. 2d 255, 272 (2008); see *Jackson v. Virginia*, 443 U.S. 307 (1979). The trier of fact's findings regarding the credibility of the witnesses and the

inferences to be drawn from the evidence are not conclusive, but they are entitled to significant deference. *Ross*, 229 Ill. 2d at 272.

¶ 35    First, Officer Jung testified that he *Mirandized* and interviewed defendant at the station. After the interview, the officer stayed in the room to complete some paperwork. Defendant was still there with him. Officers Aguirre and Gibbons came in and out of the room to discuss the case. Officer Gibbons asked whether the magazines should be classified as regular, extended, or high capacity. According to Officer Jung, defendant interjected that the magazines came with the gun and were not high capacity. And when Officer Gibbons asked where the gun was found, defendant "like started talking—like, started stating there's no way that I could have seen it, because there were a lot of items within the center console."

¶ 36    The trial court found that defendant's knowledge of the gun could be inferred from these statements, a reasonable inference that defendant does not dispute. But he does dispute the trial court's express finding that Officer Jung was credible. In particular, defendant points to the fact that his alleged statements were not recorded by Officer Jung's BWC, which was in use at the station to record defendant's in-station interview. And as Officer Jung acknowledged on the stand, he made no mention of defendant's statements in his case report, which stated: "Arresting officer informed RO about the recovered magazines, stating that they are factory and not extended or high capacity. Offender also asks how Officer removed the center console when he never observed RO recovering the weapon."

¶ 37    As to the BWC, the State first argues that we cannot consider it at all, since the relevant recorded portions—at the station, rather than in the parking lot—were not put into evidence at trial. Defendant responds that counsel relied on them in the post-trial motion, making them fair game on appeal. The more important point, from our perspective, is that they do not help

defendant at all. The BWC recording stops at the end of defendant's interview. According to the officer, defendant's spontaneous statements came later. We do not find it unusual that the officer would turn off his BWC at the end of the interview, apparently thinking there was no need to record himself filling out paperwork. So we would not *expect* to find defendant's statements on the BWC. Thus, their absence from the recording does not bear in any meaningful way on the credibility of the officer's testimony that defendant did indeed make them.

¶ 38 As for the omission of this incriminating evidence from the officer's case report, that is certainly a point against the officer's credibility. So, too, is the fact that the officer testified that the reason he asked for defendant's identification when he first encountered him was that defendant claimed to be waiting for his father, which the officer found suspicious because La Rabida is a children's hospital. The video evidence, however, shows that defendant made no mention of his father; when asked what he was doing parked in the lot, he told Officer Jung he was waiting for "my people."

¶ 39 But the trial court knew all of this and nevertheless found that the officer, all things considered, was "credible and compelling" regardless. We cannot say that no reasonable person would still believe the officer's testimony, despite these counterpoints. On this basis alone, we may not disturb the trial court's credibility determination.

¶ 40 Next, the trial court found that defendant's attempted flight from the scene, immediately after Officer Jung announced that he found the gun, was evidence of his consciousness of guilt. That inference is a familiar one, and it is usually deemed reasonable and sound. See, *e.g.*, *People v. Jackson*, 2019 IL App (1st) 161745, ¶ 30.

¶ 41 Here, defendant argues, that inference does not hold up, since he made only a "brief attempt to flee, while handcuffed" and "standing with four police officers." We might add that

Jackson Park sits on the lakefront, and as one of the officers can be heard musing on the BWC, "Where's he gonna go? That's the lake?" Small wonder that defendant got nowhere. But the fact that he got nowhere, and never stood a chance, does not defeat the inference of his consciousness of guilt. It simply shows the futility of his attempt.

¶ 42    Lastly, as the State points out, defendant bent down, toward the area where the gun was found, when Officer Jung first approached. Although the officer did not claim to see a weapon, and did not consider defendant a threat, our evaluation of the sufficiency of the evidence is not limited to the officer's own perspective at that time. The panel was loose, at least to some degree, according to Officer Jung, and viewing these facts in the light most favorable to the State, a rational trier of fact could infer that defendant was reaching down to stash, or otherwise check on, the gun. That, too, supports an inference of knowledge.

¶ 43    All in all, the State's proof of knowledge, if not overwhelming, was legally insufficient.

¶ 44                                II. Inevitable Discovery

¶ 45    Defendant next argues that the trial court erred in denying his motion to suppress the gun and ammunition that Officer Jung found behind what he described as a "loose" panel covering the center console of his car. The trial court found that the doctrine of inevitable discovery saved this evidence from suppression.

¶ 46    By moving directly to the question of inevitable discovery, the trial court implicitly held that the search violated the fourth amendment in the first instance. That is the only sensible interpretation of the court's ruling, as the doctrine of inevitable discovery provides that evidence obtained in an illegal search will not be suppressed if "the State can show that such evidence 'would inevitably have been discovered without reference to *the police error or misconduct*.' " (Emphases added.) *People v. Sutherland*, 223 Ill. 2d 187, 227-28 (2006) (quoting *Nix v.*

*Williams*, 467 U.S. 431, 448 (1984)). The doctrine does not even come into play unless the search at issue has been deemed unlawful under the fourth amendment in the first place; it is a reason not to suppress evidence despite the fact that it was unconstitutionally obtained.

¶ 47    That is keeping with the general shifting of burdens in a suppression hearing: If the defendant ultimately carries his burden of proving a fourth amendment violation, the burden shifts to the State to demonstrate that suppression is nevertheless inappropriate because the evidence was, or inevitably would have been, discovered by means sufficiently distinguished from the taint of the unconstitutional search. See *People v. Foskey*, 136 Ill. 2d 66, 85-86 (1990); *Brown v. Illinois*, 422 U.S. 590, 604 (1975) (burden of showing attenuation between unconstitutional search and discovery of evidence "rests, of course, on the prosecution"); *People v. Schreiner*, 2021 IL App (1st) 190191, ¶ 70. A discussion of inevitable discovery thus only makes sense after a finding that the search violated the fourth amendment.

¶ 48    The State, for its part, has not claimed otherwise on appeal. The State does not argue that the search complied with the fourth amendment. The State's argument consists solely of arguing that the fruits of the search should be not suppressed because, as the trial court ruled, they would have been inevitably discovered in an inventory search, regardless.

¶ 49    We agree with the premise, shared by the parties and at least implicitly by the trial court, that the actual search performed was unlawful. This search cannot be justified as a search incident to arrest under *Gant*, 556 U.S. 332. A warrantless search of a vehicle may be justified if incident to a lawful arrest, but only "if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest." *Id.* at 351; *People v. Bridgewater*, 235 Ill. 2d 85, 95 (2009).

¶ 50    Here, of course, there is no claim that defendant was within reaching distance of an

interior compartment of his vehicle at the time of the search. He was nowhere near his car when the search was conducted; he was handcuffed by the hood of the police vehicle. And defendant was being arrested for an outstanding warrant—the underlying offense was never mentioned at trial—so there is no evidence that the officer was searching for evidence of *that* offense.

¶ 51    Nor has the State ever claimed, or would the evidence show, that the search was based on probable cause, so the automobile exception to the warrant requirement does not apply. See *Gant*, 556 U.S. at 347; *United States v. Ross*, 456 U.S. 798, 820-21 (1982). And it is clear that defendant did not consent to the search.

¶ 52    Finally, the State understandably makes no attempt to claim that the search that uncovered the gun was, itself, an inventory search. Officer Jung testified that the car was impounded *because* a gun was found during the search. For that reason alone, the search, which obviously preceded the decision to take the car into police custody, was clearly an investigative search, not an inventory search. Nor does the video remotely suggest that the officer was inventorying the contents; he was searching for contraband. The officer was not executing a "police caretaking procedure[ ] designed to secure and protect vehicles and their contents within police custody," but, rather, was necessarily acting "for the sole purpose of investigation." *Colorado v. Bertine*, 479 U.S. 367, 372 (1987).

¶ 53    In sum, suffice it to say that the State did not produce, nor has it ever claimed to have produced, any evidence to rebut defendant's *prima facie* case that the warrantless search of his car was unlawful. See *People v. Gipson*, 203 Ill. 2d 298, 306-07 (2003) (warrantless search of car established *prima facie* case; thus, State had "burden of going forward with the evidence" to establish exception to warrant requirement).

¶ 54    With that said, as previously noted, evidence secured by an unreasonable search will not

be suppressed if the state can establish an exception to the exclusionary rule. *Sutherland*, 223 Ill. 2d at 227-28; see *In re K.M.*, 2019 IL App (1st) 172322, ¶ 36 (attenuation, independent source, and inevitable discovery have been recognized as related exceptions to exclusionary rule). The exception at issue here, as we have noted, is the doctrine of inevitable discovery.

¶ 55    The State made almost no attempt to establish inevitable discovery. It said nothing about whether the fruits of the search could avoid suppression based on one of the attenuation doctrines. The only mention of anything about an inevitable inventory search during the combination trial/suppression hearing was this exchange with Officer Jung on direct:

> "Q.  Now, a vehicle parked in the park parking lot, at that hour, what would happen to that vehicle?
>
> A.  It can be towed."

¶ 56    That was the only mention of a tow, and no mention was ever made of an inventory search. Instead, the court made the finding of inevitable discovery, based on a future inventory search, on its own initiative.

¶ 57    The trial court reasoned that, since defendant was being arrested on an outstanding warrant, his illegally parked car would have been towed. Incident to that tow, the car would have been subject to an inventory search that would have uncovered the gun. Thus, the evidence was admissible under the doctrine of inevitable discovery, notwithstanding that the actual search of defendant's car by Officer Jung was unlawful.

¶ 58    The State echoes this position precisely on appeal, primarily focusing on the fact that the car would have been towed even if Officer Jung hadn't found a gun, because he was going to be arrested on an outstanding warrant, and the car was illegally parked.

¶ 59    To be sure, a trial court may base its ruling on an issue that was not specifically argued

by the parties. The problem here, however, is that the record was insufficient to make this finding.

¶ 60   It is well settled that, for an inventory search to be lawful, (1) the car must be lawfully impounded; (2) the search must be undertaken for caretaking (not investigative) purposes— namely, to protect the owner's property, to protect the police from claims of loss, theft, or vandalism, and to protect the police from potential danger; and (3) the search must be conducted in good faith pursuant to a reasonable, standardized police procedure that regulate an officer's discretion and thus guards against the use of an inventory search as a pretext for an investigative search that the fourth amendment would not otherwise permit. *People v. Hundley*, 156 Ill. 2d 135, 138 (1993); see *Florida v. Wells*, 495 U.S. 1, 4 (1990); *South Dakota v. Opperman*, 428 U.S. 364, 369 (1976); *Bertine*, 479 U.S. at 372-73.

¶ 61   At a minimum, the record contains no evidence of the second and third requirements. The record, for example, provides no information about a reasonable, standardized police procedure regarding inventory searches.

¶ 62   In *Wells*, 495 U.S. at 4, the Supreme Court held that an inventory search that led to the opening of a locked suitcase in the trunk was unreasonable, and thus violated the fourth amendment, because there was no standardized police policy that regulated an officer's discretion to search closed containers found in the car during an inventory search. This was not to say that a law-enforcement agency must enact a "mechanical 'all or nothing' " policy, one that either allows officers to search any closed container, or else to search none; a policy can afford officers *some* reasonable discretion to determine whether the underlying purposes of an inventory search would be served by opening a particular container, given the particular circumstances of the case. *Id.* The point was that an officer may not be afforded "uncanalized

discretion" or "so much latitude that inventory searches are turned into 'a purposeful and general means of discovering evidence of crime.' " *Id.* (quoting *Bertine*, 479 U.S. at 376 (Blackmun, J., concurring)).

¶ 63    In *Hundley*, 156 Ill. 2d at 137, a state trooper conducted an inventory search of a unoccupied car that had been involved in an accident, before it was towed to an unguarded storage facility. The trooper discovered a closed, snap-top cigarette case inside the vehicle and opened it, finding a snorting tube containing cocaine. *Id.* At trial, the State introduced into evidence a General Order of the Illinois State Police. *Id.* Our supreme court held that this policy was a reasonable, standardized procedure, and the officer acted in good-faith pursuant to that policy in opening the cigarette case, as the officer testified that women often put their driver's licenses in those containers, and he was trying to determine the identity of the vehicle owner. *Id.* at 139. Thus, the contraband was properly allowed into evidence. *Id.*

¶ 64    Here, in contrast, there is no such evidence of a reasonable, standardized procedure, as in *Wells*. The holding in *Wells* applied to closed containers, which is not exactly the situation here. But if the fourth amendment cannot tolerate unfettered police discretion to open a locked suitcase in a trunk (see *Wells*, 495 U.S. at 1), surely it cannot tolerate unfettered police discretion to dismantle parts of the car itself, to "inventory" whatever items may be lurking, out of view, within the car's innards.

¶ 65    Does CPD have such a standardized policy? As best we can tell from CPD's Department Directives System, there is but one standing order, or rather one provision of a standing order, that regulates inventory searches. It is sparse in its guidance. It simply directs officers to "remove and inventory personal property found within the vehicle" when it is impounded, with the one qualification that, "[i]f the vehicle keys are available, personal property within a locked glove

compartment or trunk will be removed and inventoried." Special Order S07-03-05, Impoundment of Vehicles for Municipal Code Violations, § III.B.7, available at http://directives.chicagopolice.org/#/directive/public/6831 (last visited March 15, 2022).

¶ 66    This provision does not speak to the issue at hand. But there may well be other provisions that do, which our search of CPD's website did not reveal. This is especially true in light of our supreme court's holding in *Gipson*, 203 Ill. 2d at 305-06, that inventory-search policies need not be in writing, as long as there is some standardized department procedure to which an officer can credibly testify at a suppression hearing. Which means that this is probably not a subject into which a court can venture on its own or amenable to judicial notice.

¶ 67    To say nothing of the fact that any such policy must avoid using inventory searches as pretexts for an investigative search (*Wells*, 495 U.S. at 4), which merges with the second requirement for a valid inventory search—that the officer's search be limited to caretaking, not investigative functions, namely to protect the owner's property, to protect the police from claims of loss, theft, or vandalism, and to protect the police from potential danger. See *id.*; *Hundley*, 156 Ill. 2d at 138. At bottom, both the second and third factors are obviously aimed at ensuring that inventory searches do not devolve into investigative searches.

¶ 68    And we can say at this stage, on this record, that there is at least a colorable question as to whether a proper inventory search would have led to a discovery of the gun, as did the search conducted by Officer Jung. The gun here was found inside part of the center console, down by the foot of the driver. Officer Jung pulled off the panel to discover the gun. He testified that the bottom right portion of the panel was "loose." From our review of the video, we are unable to see that bottom right portion. We can see most of that panel, however, and it appeared to be intact and flush against the console.

¶ 69    Does CPD policy permit officers to pull a panel off a console in search of something to inventory that is otherwise not in plain view? Would removing a "loose" panel to look inside be nothing more than a "caretaking" function necessary to protect the owner's property, to protect the police from claims of loss, or to protect the police from potential danger?

¶ 70    None of these questions were answered. Without those answers, we cannot say that a proper inventory search would have revealed the presence of that weapon. And thus we cannot find that the unconstitutional search is saved by the inevitable-discovery doctrine.

¶ 71    We will not reverse the suppression ruling outright, however, because the State never had the opportunity to prove inevitable discovery. In this regard, this case is like *Schreiner*, 2021 IL App (1st) 190191, ¶ 73, where the trial court found the police search constitutional, but on appeal we disagreed. Though we found the search unconstitutional, we recognized that, because the State had won the suppression ruling on the question of reasonableness, the burden never shifted to the State to prove attenuation. We thus remanded for an attenuation hearing. *Id*.

¶ 72    Here, much the same is true. The burden never shifted to the State to prove inevitable discovery or some other exception to the exclusionary rule, as the court raised and ruled on the question on its own. Indeed, the argument on the motion to suppress did not even involve the State. Defense counsel made its argument, and then the trial court gave its ruling based on inevitable discovery without input from the State. Under circumstances like these, fairness dictates that the State have the opportunity to be heard on the topic at an evidentiary hearing. See *id*.; *In re K.M.*, 2019 IL App (1st) 172322, ¶¶ 50-53; *People v. Ollie*, 333 Ill. App. 3d 971, 993-94 (2002); *People v. Wallace*, 299 Ill. App. 3d 9, 21 (1998).

¶ 73    We thus vacate defendant's conviction and remand this matter for an evidentiary hearing on the question of inevitable discovery. If the trial court adheres to its prior ruling that the gun

and ammunition inevitably would have been discovered during a lawful inventory search, and the evidence is thus admissible, the court should reinstate its judgment of conviction. See *Schreiner*, 2021 IL App (1st) 190191, ¶ 75. If the trial court determines that this evidence is not admissible under the doctrine of inevitable discovery, then the court should proceed from that finding.

¶ 74                                            CONCLUSION

¶ 75    Defendant's conviction is vacated. The cause is remanded for proceedings consistent with the directions given above.

¶ 76    Vacated and remanded with directions.

¶ 77    PRESIDING JUSTICE GORDON, specially concurring:

¶ 78    I agree with the majority's order, but I must write separately, as I would make additional findings to make sure that double jeopardy is no bar in the event the trial court reinstates the conviction or provides a possible retrial. See People v. Lopez, 229 Ill.2d 322 (2008).

¶ 79    In the case at bar, the State never had the opportunity to shoulder their burden to show that the inevitable discovery doctrine applies here, as the trial court pronounced that it applied without giving its reasons or whether it took judicial notice of the procedures of the police department when they search motor vehicles that are towed from a crime scene. As a result, the State should be given that opportunity as the majority explains in its order.

¶ 80    However, in directing the trial court to hold an evidentiary hearing which would be similar to an attenuation hearing, I believe this court must make a finding that we have reviewed the supporting evidence and determined that it was sufficient to support the defendant's conviction if there is sufficient evidence that the inevitable discovery doctrine is applicable here. Lopez 229

Ill.2d at 367 (in determining the sufficiency of evidence for double jeopardy purposes, reviewing courts may consider inadmissible as well as admissible evidence at the original trial).

¶ 81     I agree with the majority that defendant's conviction be vacated and the matter remanded for an evidentiary hearing on the issue of inevitable discovery, and if the trial court adheres to its prior ruling that the gun and ammunition would inevitably have been discovered during a lawful inventory search, the trial court should reinstate its judgment of conviction. However, I would find that if the trial court determines after an evidentiary hearing that this evidence is not admissible under the doctrine of inevitable discovery, the trial court should make a finding of not guilty and find for the defendant.